Luanne LeMASTER, Plaintiff,

v.

**USAA LIFE INSURANCE CO., Defendant.**

No. 95–1124–CIV–T–17E.

United States District Court,
M.D. Florida,
Tampa Division.

April 10, 1996.

See also, 1995 WL 708656.

Kevin Hackett O'Neill, Eugene C. Langford, Timothy N. Tack, Langford & Hill, P.A., Tampa, FL, for Luanne LeMaster.

Kirk M. Gibbons, John R. Bello, Jr., Chorpenning, Good, Gibbons & Cohn, Tampa, FL, for USAA Life Insurance Company.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KOVACHEVICH, Chief Judge.

This action is before the court on the following motions and responses:

1.  Defendant, USAA Life Insurance Company's (hereafter "USAA"), motion for summary judgment and memorandum of law in support, filed December 1, 1995. (Docket No. 17)
2.  Plaintiff, Luanne LeMaster's (hereafter "Mrs. LeMaster") memorandum of law in opposition to Defendant's motion for summary judgment, filed January 9, 1996. (Docket No. 28)

### Facts

On January 13, 1993 William D. LeMaster (hereafter "Mr. LeMaster") applied to USAA for life insurance in the amount of $200,000. The application included a line of questions concerning the well being of the applicant including the following: "Has any proposed insured ... ever ... had or been treated by a physician or consulted with a health advisor for ... cancer...." Mr. LeMaster responded in the negative. As condition to answering the propounded questions, the application required that the proposed insured answer "to the best of [his] knowledge and belief." In addition, the application included a medical records release form which authorized USAA to obtain any of Mr. LeMaster's medical records over the ensuing two and one half years.

On January 16, 1993, a paramedic working for USAA conducted an examination of Mr. LeMaster which included the taking of an electrocardiogram (hereafter "EKG"). On January 22, USAA requested that Mr. LeMaster fill out an addendum to the original application which in part asked the following question: "to the best of your knowledge and belief do you have or have you ever had or been treated for ... cancer...." Again, Mr. LeMaster answered in the negative. USAA then sent a letter, dated January 28, 1993, to Mr. LeMaster refunding the monthly premiums that he had sent which were originally set at $197.71 per month. The letter stated that USAA needed to review Mr. LeMaster's "medical history" before it could render a decision and requested that Mr. LeMaster provide assistance in obtaining his medical records from Dr. Malpartida and North Florida Regional Medical Center, the health care providers which Mr. LeMaster had disclosed earlier in the application process. The letter further provided that no coverage would be extended until the information was received. USAA asserts that after receiving medical records relating to Mr. LeMaster from Dr. Malpartida on February 8, 1993, and from North Florida Regional Medical Center on February 10, 1993, the company continued to process Mr. LeMaster's application.

The medical records which USAA submitted to the Court indicate that Mr. LeMaster was hospitalized at North Florida Regional Medical Center on February 16, 1993, and that he was discharged February 25, 1993. Sometime during this stay, Mr. LeMaster was diagnosed as having metastic malignant melanoma of which he later died in November, 1993. These medical records also indicate that, during treatment of Mr. LeMaster, "Champus" supplemental medical claims were made with USAA's medical claims department. In addition, Robert Buss, a regional sales manager for USAA, stated in deposition that USAA's computer information system is able to access the status of the medical supplemental coverage for USAA's life insurance policyholders.

On February 26, 1993, the day after Mr. LeMaster's release from North Florida Regional Medical Center, USAA sent its paramedic to Mr. LeMaster's residence to conduct a second examination in which the paramedic took Mr. LeMaster's blood pressure and pulse and administered an EKG. Defendant made no further contact with Mr. LeMaster until March 30, 1993, when USAA sent a letter to Mr. LeMaster indicating that it was unable to extend coverage for the original premium of $197.71 per month. Instead USAA stated that it would be able to extend coverage at an increased premium of $351.05. Although USAA attributes the increased premium to the EKGs performed by the paramedic, the letter did not specify the basis for the increase in premium; rather, it stated that

the cost increase was consistent with LeMaster's "medical history." In addition, the letter made no reference to the type of information it received from North Florida Regional Medical Center or when that information was received.

On April 20, 1993, USAA and Mr. LeMaster entered into an issuance agreement for the new premium amount which was subject to USAA's final approval. The agreement, labeled "Request for Amendment of Application," provided for the increase of the insurance premium and stated that the "proposed insured shall provide additional evidence of insurability ... if required by the rules and practices of [USAA]...." USAA gave its final approval for the policy on May 3, 1993, over three and one half months after Mr. LeMaster submitted the original application.

After her husband's death in November of 1993, Mrs. LeMaster filed a claim for death benefits with USAA. USAA rejected the claim and returned the premiums which it had collected from the inception of the policy. As justification for denying the benefits under the policy, USAA stated that Mr. LeMaster had "committed a material and fraudulent omission during the application process." Mrs. LeMaster then filed this action.

In response to Mr. LeMaster's suit for payment of the benefits under the policy, USAA contends that Mr. LeMaster was under the affirmative duty to disclose the circumstances surrounding his hospitalization since it occurred while the application was still pending. USAA asserts that his failure to provide this information entitles USAA to rescind the policy. Mrs. LeMaster contends that the information contained in the application was correct at the time that the application was submitted. She further contends that USAA misled Mr. LeMaster into believing that the medical information that it had on file was adequate. Moreover, Mrs. LeMaster contends that USAA failed to exercise the level of care commensurate with the standards of insurance industry in ensuring that it had adequate medical information regarding Mr. LeMaster while underwriting the policy.

### Summary Judgment Standard

■ Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits if any show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Only when the moving party has sustained its initial burden of showing the court that there is no genuine issue of material fact, should a court, viewing all the evidence in the light most favorable to the non-moving party, grant a motion for summary judgment in the moving party's favor. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983).

■ Once the moving party has established the absence of a genuine issue of material fact, to which the non-moving party bears the burden at trial, "Rule 56(e) ... requires the nonmoving party to go beyond the pleadings ... and designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986). The nonmoving party succeeds in establishing that the issues of fact are "genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

### Discussion

■ LeMaster asserts that a material issue of fact exists as to whether USAA has waived or is estopped from rescinding the life insurance policy.[1] Florida Statute 627.409 (1995) provides:

1. In its memorandum, Plaintiff's counsel supported certain propositions by citing to *"American Southern Life Ins. Co. v. [Hardy] Hardee [sic]*, 202 So.2d 98 (Fla. 4th DCA 1967)," and *Brown v. Travelers Ins. Co.*, 641 So.2d 916 (Fla. 4th DCA 1994), without providing the Court with the subsequent histories of these cases. *See* Counsel for Plaintiff memorandum at 9, 12. The Florida Supreme Court has reversed *Hardy*, and the Fourth District Court of Appeal has withdrawn *Brown*. *See Hardy v. American Southern Life Ins. Co.*, 211 So.2d 559 (Fla.1968) and *Brown v. Travelers Ins. Co.*, 649 So.2d 912 (Fla. 4th DCA 1995) respectively. The Court finds this type of mis-

(1) Any statement ... made by ... an insured or an annuitant in an application for an insurance policy ... is a representation and not a warranty. A misrepresentation, omission, concealment of fact, or incorrect statement may prevent recovery under the contract or policy only if ...:

(a) The misrepresentation, omission, concealment, or statement is fraudulent or is material either to the acceptance of the risk or to the hazard assumed by the insurer.

(b) If the true facts had been known to the insurer pursuant to a policy requirement or other requirement, the insurer in good faith would not have issued the policy ..., would not have issued it at the same premium rate, [or] would not have issued [it] in as large amount....

■ Notwithstanding this statutory rescission defense, as a general rule in Florida, forfeitures of insurance policies are not favored, especially when the event that gives rise to the insurer's liability has occurred. *Johnson v. Life Insurance Co. of Georgia,* 52 So.2d 813, 815 (Fla.1951); *see Travelers Protective Ass'n of America v. Jones,* 91 F.2d 377, 378 (5th Cir.1937). In addition, Florida has recognized the theories of estoppel and waiver in the insurance contract setting. *See Gulf Insurance Co. v. Green,* 80 So.2d 321 (Fla.1955). "Waiver and estoppel may apply when the insured is deceived or misled to his detriment...." *Schrader v. Prudential Insurance Co. of America,* 280 F.2d 355, 364 (5th Cir.1960). However, there can be no waiver without express or implied knowledge of that which is to be waived. *Green,* 80 So.2d at 322. "Waiver and estoppel may apply when the insured is deceived or misled to his detriment...." *Schrader v. Prudential Insurance Co. of America,* 280 F.2d 355, 364 (5th Cir.1960).

### Knowledge on the part of insurer

In *Johnson v. Life Insurance Co. of Georgia,* an insured's widow filed a claim with the defendant for life insurance benefits under a policy that it had issued. *Id.* at 814. The policy contained a provision requiring that the insured "be in sound health at the time of delivery of the policy." *Id.* Before delivery of the policy, a physician diagnosed the insured with pulmonary tuberculosis of which the insured later died. *Id.* An agent for the insured learned of the insured's condition two months after the issuance of the policy, but the insurer continued to collect the policy premiums. *Id.*

The Johnson court held that the widow of the insured was entitled to full recovery under the policy. *Id.* at 816. In reaching this conclusion, the court noted that the knowledge of an agent "is imputable to his principal whether disclosed by him to it or not" and that an insurer would be bound by such knowledge. *Id.* at 815; *see also Hardy v. American Southern Life Insurance Co.,* 211 So.2d 559, 560–561 (Fla.1968). In addition, the court stated that constructive notice of facts may be the equivalent to knowledge under circumstances where the notice has been deliberately disregarded. *Id.* Since an agent of the insurer knew of the insured's hospitalization for tuberculosis just two months after the policy was issued, the court found that the company should have made further inquiry as to the state of health of the insured at the time the insurer delivered the policy. *Id.* The court determined that the nature of the insured's illness was such that notice of it should have "excited the [insurer's] attention" to inquire into the insured's state of health which would have justified forfeiture of the policy. Thus, the *Johnson* court concluded that the insurer's subsequent action of accepting premiums, an action which was inconsistent with the policy's forfeiture, constituted a waiver of the right to assert forfeiture as a defense. *Id.*

■ In the present case, the facts indicate that Mr. LeMaster had made claims to USAA's medical health supplement department for the expenses he incurred during his treatment for cancer. Moreover, there is evidence that the computer system at USAA can access the information contained at different departments, including information concerning the coverage for supplemental medical benefits. Finally the evidence is uncontroverted that the premiums for Mr. Le-

leading citation to authority careless and inexcusable.

Master's life insurance had been collected by USAA until his death. Based on the evidence before it, the Court concludes that a reasonable jury could find that the medical supplement department's knowledge of the medical claims for cancer treatment should be attributed to the underwriting department or were sufficient to "excite the attention" of USAA to make further inquiry into Mr. LeMaster's state of health. Viewing the evidence in a light most favorable to Mrs. LeMaster, a reasonable jury could determine that sufficient facts are present indicating that USAA has waived its right to assert a rescission defense since it acted inconsistently with protection of this right by continuing to collect policy premiums.

USAA asserts, without citing to any evidence in support, that the information regarding Mr. LeMaster's medical claims made by Mr. LeMaster's health care providers was not "readily and timely available to the [life insurance] underwriting department." USAA memorandum at 17. In addition, USAA contends that it was not USAA's policy for its life insurance underwriting department "to check the health claim department's records in connection with investigating, considering, or processing an individual's application for life insurance benefits." USAA memorandum at 17. In support of USAA's contention that it should not be held to such a standard, USAA cites to *Schrader v. Prudential Insurance Co. of America*, 280 F.2d 355 (5th Cir.1960). The Court finds *Schrader* readily distinguishable.

In *Schrader*, an insurance company's employee, acting as insurance agent for himself, submitted an application for life insurance to his employer in which he represented that he had never been treated for cancer. *Id.* at 358 n. 3. In fact, the employee had a malignant melanoma removed from his back two years prior to submitting the application which required several return visits to his physician for examination. *Id.* at 357. In addition, on the date of, but prior to submitting the application, the employee had visited a physician regarding several lumps which had appeared on various parts of his body at which time the physician advised the employee that the lumps were probably malignant.

*Id.* at 357–58. For each of these visits, the employee had submitted claims under a group medical policy to the insurance company. The employee died less than two years later from a malignant melanoma of the brain. *Id.* at 358.

Against the beneficiaries claim that the insurance company had waived its right to rescind the policy, the *Schrader* court found that the knowledge of the insurance company's group medical division could not be imputed to the life insurance underwriting department. However, in specifically limiting its holding, the *Schrader* court stated:

> We do not base our decision solely on the general proposition that an insurance company's underwriting division is not chargeable with information contained in its files covering group insurance. We have before us three salient facts: (1) the insured obtained a policy fraudulently by withholding information he should have disclosed and by giving information he knew to be false; (2) as a[n insurance] agent, Schrader knew or had reason to know that the damaging information on his claims under his group hospitalization policy would not be disclosed in the routine processing of his "clean" application for an individual life insurance policy; (3) as the insured and as the agent writing his own insurance, Schrader was in a dual position putting him under a high obligation to act in good faith and loyalty to his employer.

*Schrader*, 280 F.2d at 362.

None of the facts so salient to the *Schrader* decision exist in the present case. First, there is no evidence establishing that, despite the applications requirement that he answer to the best of his knowledge or belief, Mr. LeMaster knew of facts establishing that he had cancer when he filled out the original application or the application addendum in January. Rather the medical records provide that Mr. LeMaster was not treated or diagnosed with cancer until sometime during mid-February. The answers to the questions propounded in the application were neither the intentional nor "nonintentional misstatements" which will prevent recovery under an insurance policy, *see Continental Assurance Co. v. Carroll*, 485 So.2d 406, 409 (Fla.1986),

since they were not misstatements. Any inference that Mr. LeMaster *knew* of the facts of his illness, at the time of the application and prior to his treatment and diagnosis one month later, should properly be drawn by a jury. *See Hauser v. Life General Sec. Insurance Co.,* 56 F.3d 1330 (11th Cir.1995) (precluding summary judgment and finding that where insurer only requested disclosure of information to the best of the insured's knowledge and belief, insurer would not be protected by a court from the risk it assumed by virtue of the contractual language it drafted); *William Penn Life Insurance v. Sands,* 912 F.2d 1359, 1363–64 (11th Cir.1990). Second, unlike *Schrader,* there is nothing in the record before the Court to indicate that Mr. LeMaster had reason to believe that information accompanying his cancer treatment claims which were provided to USAA's supplemental medical department would not be also be available to USAA's life insurance underwriting department. Finally, Mr. LeMaster was not acting as both agent and insured when he submitted the application for life insurance. Therefore, Mr. LeMaster should not be held to the heightened duty of disclosure attendant to such a fiduciary relationship.

### Duties of the parties to the insurance contract

■ USAA asserts that Mr. LeMaster had a duty to disclose to USAA the fact that he had cancer to prior to the policy becoming effective in May of 1993 and cites *Disposable Services, Inc. v. ITT Life Insurance Co. of New York,* 453 F.2d 218 (5th Cir.1971), *cert. denied,* 409 U.S. 1023, 93 S.Ct. 462, 34 L.Ed.2d 314 (1972) in support of this proposition. In *Disposable Services,* the insurance applicant went to a physician who told him that he probably had a kidney stone that would require hospitalization for further examination. *Id.* at 219. Two days later he mailed a check for the first premium of his insurance policy which was required by his insurer in order to activate the policy. The Court determined that under Florida law "an applicant for life insurance owed a duty of informing the insurer of a material change in his health, which occurred subsequent to completion of the application for insurance but prior to the effective date of the policy."

*Id.* at 221 (citing *Stipcich v. Metropolitan Life Insurance Co.,* 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895 (1928)). Finding that the applicant knew of a material change in his health condition, two days before the policy could have become effective, the Court concluded that the applicant had failed to satisfy his duty of disclosure.

However the *Disposable Services* court was not presented with an issue of waiver or estoppel as exists in the instant case. It is reasonable for a jury to conclude that LeMaster had satisfied his duty to disclose his change in medical condition as a result of the disclosure of his condition to USAA via the medical supplement department. In addition, Mr. LeMaster informed USAA of the identity of his treating physician and the hospital he had attended who possessed medical records pertaining to his condition. Mr. LeMaster knew from a letter sent by USAA that the insurance company was deferring its approval of the policy until it had received Mr. LeMaster's medical records, and he provided a release form which enabled USAA to obtain medical records over the course of the underwriting period. It would be reasonable for a jury to find that Mr. LeMaster believed he had satisfied all disclosure requirements particularly since, during the latter part of the underwriting period, USAA provided a form which substantially increased his monthly premium and which stated that the requirement "to provide additional evidence of insurability" depended on whether "the rules and practices of the company on the date of [the] application" required such disclosure. *See* Exhibit E, Affidavit of Michael Egan; *cf. Stipcich,* 277 U.S. at 315, 48 S.Ct. at 513 (finding that an insurer could assume the risk of changes in the insured's health which occur between the date of application and the date of issuance).

■ Mrs. LeMaster similarly contends that USAA failed to satisfy its duty with respect to the underwriting process. She asserts that USAA's failure to discover her late husband's medical condition is not due to a lack of available information but due to USAA's failure to exercise reasonable diligence in performing its underwriting inquiry.

Florida has recognized that when an insurer undertakes an independent investigation of an applicant's insurability "the [insurer] is charged with all knowledge which it might have obtained had it pursued [its] inquiry to the end with reasonable diligence and completeness." *Columbian National Life Insurance Co. v. Lanigan,* 154 Fla. 760, 19 So.2d 67, 71 (1944) (finding that insurer was put on notice of facts which would have allowed rescission when the insurer undertook an independent medical examination and was provided with the names of the hospital and treating physicians of the insured); *Fecht v. Makowski,* 172 So.2d 468, 470–471 (Fla. 3d DCA 1965) (finding that two investigations, which were independent of the application for insurance and which were conducted by a representative of the insurer, "made the significance of the [incorrect] statement in the application less determinative of the company's reliance on the application" in deciding to insure the applicant).

In support of this assertion, Mrs. LeMaster submitted an affidavit of J. Richard Brinkley, an expert regarding matters which pertain to the life and health insurance industry. In reviewing the same information that is presently before the Court, Brinkley opines that "USAA failed to exercise that level of diligence and care commensurate with the prevailing life insurance underwriting customs, practices and standards regarding the investigation and processing of the subject life insurance application." Brinkley Affidavit at 2–3. As the basis for this conclusion, Brinkley found significant USAA's failure to update the medical information through the sources disclosed by LeMaster over the extended duration of the application review process. Brinkley further found misleading USAA's explanation for the increase in premium as a cost which is consistent with LeMaster's "medical history" rather attributing the increase specifically to the EKG's performed by the paramedic.

Viewing the evidence in a light most favorable to Mrs. LeMaster, the Court finds that a trier of fact could reasonably conclude that USAA has waived or is estopped from asserting its right to rescind and that USAA's decision to approve Mr. LeMaster's applica-

tion for insurance was due to a failure on the part of USAA to exercise due diligence in the underwriting process rather than a failure on the part of Mr. LeMaster to satisfy his duty to disclose a change in medical condition. Accordingly it is

**ORDERED** that Defendant, USAA Life Insurance Company's motion for summary judgment (Docket No. 17) be **DENIED.**

**DONE AND ORDERED.**